UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
ALLEN BLAKE,

                        Petitioner,                    10 Cr. 349 (RPP)
                                                    12 Cv. 1843 (RPP)

        - v. -

                                           **OPINION & ORDER**

UNITED STATES OF AMERICA,

                        Respondent.
----------------------------------------------------------X

**ROBERT P. PATTERSON, JR. U.S.D.J.**

       On October 13, 2011, Petitioner Allen Blake ("Blake" or "Petitioner") filed a motion pursuant to 28 U.S.C. § 2255 ("§ 2255") to vacate and set aside judgment of his conviction for mail fraud in violation of 18 U.S.C. §§ 1341 and 1342.

       For the reasons set forth below, Petitioner's motion is denied.

## I.     FACTUAL BACKGROUND[1]

       From 2006 to November 20, 2009, Blake, a correctional officer employed by the City of New York Department of Corrections, was a board member of the Correction Officer's Benevolent Association ("COBA").  As part of his union contract with COBA, Blake was entitled to death benefits with Prudential Life Insurance Company of America ("Prudential") in the event of the death of his lawful spouse. (Trial Transcript ("Tr.") at 307, 332.)  In May 2008, Blake filed for divorce from his estranged wife, Pearl Blake. (Gov't Trial Ex. 7.)  Blake was represented in the divorce proceedings by the law firm of Koehler & Isaacs ("K&I"), which had a contract to represent COBA and COBA members. (Tr. at 613.)  The divorce was granted on

---

[1] The factual information in this section is taken in large part from this Court's opinion in <u>United States v. Blake</u>, No. 10 Cr. 349 (RPP), 2011 WL 3463030 (S.D.N.Y. Aug. 5, 2011).

June 23, 2009. (Gov't's Trial Ex. 4.)  Pearl Blake died three months later, on September 29, 2009. (Gov't's Trial Ex. 12; Tr. at 332.)

On October 23, 2009, Blake submitted a claim to Prudential for a $10,000 death benefit for Pearl Blake's death, listing his relationship to the deceased as "husband." (Gov't's Trial Ex. 3; Tr. at 322.)  On or about November 17, 2009, Blake received $10,000 on the policy from Prudential. (Tr. at 328-29.)  Shortly thereafter, other COBA board members learned about Blake's divorce. (Id. at 332-35.)  At an emergency COBA Board meeting on November 20, 2009, Norman Seabrook ("Seabrook"), the President of COBA, confronted Blake and asked him to "[e]xplain to me how this death benefit [claim] is put in and you don't have the [supporting] documents." (Id. at 592.)  Blake "just shook his head," and Seabrook demanded and received Blake's resignation that same day. (Id. at 593-94.)  On or around November 25, 2009, Blake returned to Prudential the $10,000 he had received on the policy. (Id. at 410-11, 423-27.)

On April 20, 2010, Blake was indicted on mail fraud in violation of 18 U.S.C. §§ 1341 and 1342, for devising a scheme to defraud an insurance company of life insurance benefits to which he was not entitled and in which the United States Postal Service (the "U.S.P.S.") was used.  The critical issue at trial was whether Blake knew that his divorce had already been finalized on or before October 23, 2009, the date he submitted his claim for death benefits. (See United States v. Blake, No. 10 Cr. 349 (RPP), 2010 WL 3184487, at *1 (S.D.N.Y. Aug. 9, 2010).)  At trial, the Government presented documentary evidence and witness testimony supporting its position that Blake intentionally and knowingly submitted a false life insurance claim on behalf of the deceased Pearl Blake.

Documentary evidence presented by the Government included: (1) a copy of Blake's divorce judgment signed by the county clerk on June 23, 2009, and filed with the New York

County Clerk's Office on July 7, 2009, (Gov't's Trial Ex. 4); (2) COBA mail logs registering received delivery of a letter from K&I to Blake at his COBA office on July 23, 2009, (Gov't's Trial Ex. 9); and (3) an opened envelope addressed to Blake bearing a barcode consistent with processing through the U.S.P.S., and postmarked July 21, 2009, along with a letter addressed to Blake from K&I paralegal Claudia Tejada ("Tejada"), dated July 21, 2009, (Gov't's Trial Ex. 6), confirming finalization of Blake's divorce.

At trial, Tejada testified that on July 13, 2009 she called Blake and "told him that . . . his divorce was signed." (Tr. at 508.)  She also testified that on July 21, 2009, she mailed to Blake, via the U.S.P.S., a letter confirming his divorce and a copy of the divorce judgment in a K&I envelope. (Id. at 510-11, 519; Gov't's Trial Ex. 6.)  Tejada further testified that the divorce judgment was dated July 7, 2009, "the date that it was actually filed in the [office of the] county clerk." (Tr. at 514.)  The parties stipulated that the divorce judgment was "an official public record of the judgment of divorce," and it was admitted into evidence without objection. (Id. at 513; Gov't's Trial Ex. 4.)

Joseph Bracco ("Bracco"), a member of the COBA Executive Board, testified that on or about September 29, 2009, the day of Pearl Blake's death, Blake told him that "it was messed up that he couldn't collect on the life insurance policy because . . . he had just recently became [sic] divorced in July," and that Blake asked him whether "there was a grace period" on the policy, to which Bracco replied there was not. (Tr. at 438.)  Thomas Farrell, a COBA Board Member, testified that in September 2009, Blake told him that he was going to South Carolina for his "ex-wife's funeral," and that "[if] the bitch or broad would have died a couple of months earlier, [he] would have gotten the money." (Id. at 652-55.)  Seabrook testified that Blake told him that his "exwife [sic] [had] died" sometime in September 2009. (Id. at 589.)  Seabrook also testified that

when Blake was confronted at the November 20, 2009 COBA Board meeting, "[Blake] looked at me and he said, 'I fucked up.'" (Id. at 593.)

Elias Husamudeen ("Husamudeen"), the First-Vice President of COBA, testified that as he was cleaning Blake's former office at COBA on a weekend in February 2010 (approximately three months after Blake's resignation), he found an opened envelope and enclosed letter addressed to Blake, dated July 21, 2009, confirming Blake's divorce finalization. (Id. at 538; Gov't's Trial Ex. 6.)  Husamudeen further testified that the letter had been received and logged into the COBA system on July 23, 2009. (Tr. at 542; Gov't's Trial Ex. 9.)  Elizabeth Castro ("Castro"), the Third-Vice President of COBA, testified that she discovered a receipt of Blake's submitted claim to Prudential, and that the claim contained a representation by Blake that he was married to Pearl Blake, when, in fact, the two were divorced. (Tr. at 309-25, 329-33; Gov't's Trial Ex. 2.)

Blake, who was represented by attorney Anthony Ricco ("Ricco") at trial, did not testify, but presented the testimony of one witness and introduced one set of documents into evidence. The witness was Investigator Jacqueline Maquine ("Maquine"), of the New York City Department of Investigations, who testified that in December 2009, she conducted an interview with Bracco, and that she memorialized that interview in a written report.[2] (Tr. at 712-15.)  This report contained information which was somewhat inconsistent with Bracco's trial testimony. (Id.)  The set of documents consisted of a file maintained by Prudential relating to Blake's claim (the "Prudential file") (Blake Trial Ex. A). (Id. at 731, 745.)  The Prudential file was admitted into evidence over the Government's objection, and included a copy of the divorce judgment filed in the County Clerk's office on July 7, 2009, bearing a timestamp of July 11, 2009 (thereby

---

[2] Maquine provided copies to the Government of the statements made to her by Castro, and the Government included the statements in its 3500 materials. (Tr. at 713.)

conflicting with the timestamp of June 1, 2010 on the divorce judgment entered into evidence as Government Trial Exhibit 4).[3] (Id. at 734-42.)

## II.    PROCEDURAL HISTORY

On June 15, 2010, following three days of trial, the jury returned a verdict of guilty on the single count of mail fraud contained in the Indictment. (Id. at 873-74; see J. dated Nov. 1, 2010.) On July 5, 2010, Blake filed a motion for a new trial pursuant to Fed. R. Crim. P. 33(b)(2) ("Rule 33"), on the grounds that (1) the testimony of Tejada was "patently incredible and defie[d] physical realty [sic]"; and (2) the prosecution failed to disclose the source of an exhibit in violation of Blake's due process rights. (Def.'s Mem. in Supp. Mot. New Trial dated July 5, 2010 at 3-4.)  On August 9, 2010, the Court denied the motion on the ground that there was "substantial evidence corroborating Ms. Tejada's testimony" and that "source information appeared on the document itself undermin[ing] [Mr. Blake's] claim that this information was 'suppressed' by the Government." Blake, 2010 WL 3184487, at *6.  On November 1, 2010, Blake was sentenced to three years of probation with three months of home confinement. (See J. dated Nov. 1, 2010.)

On February 24, 2011, Blake, pro se, filed a second Rule 33 motion, arguing that he was entitled to a new trial because (1) he received ineffective assistance of counsel due to the fact

---

[3] At trial, the Government explained the differences in the timestamps as follows:

> The document that's in the Prudential file is time stamped July 11, 2009.  Government Exhibit 4 that's been admitted into evidence and that the parties stipulated to contains a time stamp of June 1, 2010.  The reason why that is . . . is that the Department of Investigation, as they were preparing for this case, went to the family court to obtain a certified copy of that judgment.  We have that copy.  We have the actual original certified copy.  This time stamp reflects that. You can read it . . . . It says that, "I've compared this copy with the original filed in my office on July 7, 2009."
>
> These documents are the exact two same documents - - they're the exact document, which is the judgment of divorce dated July 7, 2009.  The time stamp only reflects that someone went to the family court and obtained a certified copy of the judgment.

(Tr. at 734-35.)

that his trial counsel did not present material evidence that would have impeached two key

Government witnesses, (2) he learned after his conviction that federal mail fraud is limited to

bribery and kickbacks, and as neither was alleged in his case, his conviction was invalid, and (3)

he learned after his conviction that New York law does not criminalize life insurance fraud, and

thus federalism concerns precluded the Government from prosecuting an act that New York state

does not recognize as criminal. (Def.'s Mem. in Supp. Mot. New Trial dated Feb. 24, 2011 at 1-

3.)  Following the filing of this motion, Blake retained attorney Damond Carter ("Carter") to

represent him in the matter.  On April 4, 2011, Blake also filed a motion for a default judgment

as a result of the Government's delay in responding to the motion for a new trial.  On August 5,

2011, the Court denied both motions, holding that Blake's motion for a new trial was untimely

and not based on newly discovered evidence, and thus procedurally barred. See United States v.

Blake, No. 10 Cr. 349 (RPP), 2011 WL 3463030, at *1 (S.D.N.Y. Aug. 5, 2011).  Blake did not

appeal his judgment of conviction.

On October 13, 2011, Blake filed the instant motion pursuant to § 2255 through his

attorney Carter.  Petitioner seeks to vacate his conviction on the grounds that (1) the Government

knowingly or negligently produced perjurious evidence; (2) he received ineffective assistance of

counsel in violation of the Sixth Amendment of the United States Constitution; and (3) the

Skilling and Black decisions preclude his mail fraud conviction. (Pet'r's Mem. in Supp. Mot.

Vacate ("Pet'r's Mem.") at 1.)  On March 5, 2012, the Government filed its opposition papers to

Blake's motion to vacate, and on April 4, 2012, Blake submitted a reply memorandum.

### III.    LEGAL STANDARD

Under Title 28 U.S.C. § 2255, a person convicted under federal law and in custody may

6

move the sentencing court "to vacate, set aside or correct the sentence."[4]  To obtain relief under § 2255, a petitioner must show that his sentence "(1) was imposed in violation of the U.S. Constitution or the laws of the United States; or (2) was entered by a court without jurisdiction to impose the sentence; or (3) exceeded the maximum detention authorized by law; or (4) is otherwise subject to collateral attack." Adams v. United States, 372 F.3d 132, 134 (2d Cir. 2004). Here, it is the fourth provision for collateral attack that Blake argues is relevant to his motion.

A collateral attack on a final judgment is usually only available for "a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)). A collateral attack "is not a substitute for direct appeal and petitioners are therefore generally required to exhaust direct appeal before bringing a petition under § 2255." United States v. Dukes, 727 F.2d 34, 41 (2d Cir. 1984); see United States v. Vilar, 645 F.3d 543, 548 (2d Cir. 2011) (reasoning that judicial economy and fairness to the defendant favor adjudication of direct appeals prior to, rather than after, habeas collateral attacks).  A claim that could have been brought on direct appeal is procedurally barred unless the petitioner demonstrates "either: (1) 'cause for failing to raise the issue, and prejudice resulting therefrom;' or (2) 'actual innocence.'" Rosario v. United States, 164 F.3d 729, 732 (2d Cir. 1998) (citations omitted).

"Cause" exists when some external factor impedes a petitioner's ability to comply with a

---

[4] 28 U.S.C. § 2255 provides, in pertinent part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside, or correct the sentence.

procedural rule, Murray v. Carrier, 477 U.S. 478, 488 (1986), such as "interference by state officials, ineffective assistance of counsel, or that 'the factual or legal basis for a claim was not reasonably available' at trial nor on direct appeal," Caswell v. Racetti, No. 11-CV-0153 (MAT), 2012 WL 1029457, at *6 (W.D.N.Y. Mar. 26, 2012) (quoting Murray, 477 U.S. at 488).  To show "prejudice," "the petitioner must establish 'a reasonable probability' that, but for the violation of federal law, the outcome of the case would have been different." Canteen v. Smith, 555 F. Supp. 2d 407, 412 (S.D.N.Y. 2008) (quoting Mathis v. Hood, 937 F.2d 790, 794 (2d Cir.1991)).  To establish a claim of "factual (or actual) innocence," a petitioner

> must show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial, the trier of the facts would have entertained a reasonable doubt of his guilt.  Thus, the question whether the [petitioner] can make the requisite showing must be determined by reference to all probative evidence of guilt or innocence.

Kuhlman v. Wilson, 477 U.S. 436, 454 n.17 (1986) (emphasis in original) (internal citations and quotation marks omitted).

An ineffective assistance of counsel claim is not subject to the procedural default rule, and "may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." Massaro v. United States, 538 U.S. 500, 504 (2003).

## IV.    DISCUSSION

### A.    Perjured Testimony Claim

#### 1.    *Procedural Default*

In this Circuit, a claim of perjury or prosecutorial misconduct is subject to the procedural default rule. See United States v. Peirce, No. 06 Cr. 1032 (RJS), No. 11 Cv. 2526 (RJS), 2011 WL 4001071, at *2 (S.D.N.Y. Aug. 29, 2011) (holding that petitioner failed to show cause for

her failure to raise her claim of perjury on direct appeal); <u>Mendivelso v. United States</u>, 507 F. Supp. 2d 331, 340-41 (S.D.N.Y. 2007) (denying petitioner's claim of prosecutorial misconduct because petitioner did not show "cause for his failure to raise his claims on direct appeal" or provide "a valid reason why his claims could not have been made earlier").

Blake did not file a direct appeal after his conviction and subsequent denial on his second motion for a new trial.  He does not provide any justification for his failure to raise this claim on a direct appeal nor does he provide a valid reason why his claim could not have been made earlier.  He is therefore procedurally barred from raising this claim for the first time on a collateral attack under § 2255. <u>See</u> <u>Bousley</u>, 523 U.S. at 622-23.

    2.    *The Merits*

Notwithstanding this procedural defect, Petitioner's argument is meritless.  In order to prevail on a claim that a witness gave perjured testimony, a petitioner must demonstrate that the witness gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." <u>United States v. Dunnigan</u>, 507 U.S. 87, 94 (1993); <u>see</u> <u>United States v. Agudelo</u>, 414 F.3d 345, 349 (2d Cir. 2005) (defining perjury as "(a) the intentional (b) giving of false testimony (c) as to a material matter").  "Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." <u>United States v. Monteleone</u>, 257 F.3d 210, 219 (2d Cir. 2001).  Nor is perjury proven "by showing that testimony of a witness is inconsistent with the statements of another witness." <u>United States v. Schlesinger</u>, 438 F. Supp. 2d 76, 106 (E.D.N.Y 2006) (internal citations omitted).  A petitioner must further show that the false testimony caused prejudice by demonstrating that "but for the perjured testimony, the defendant would most likely not have been convicted." <u>United States v. Wallach</u>, 935 F.2d 445, 456 (2d Cir. 1991) (internal citations

omitted).

Blake first argues that the Government knowingly or negligently used perjured testimony from two Government witnesses – Castro and Husamudeen – to obtain his conviction. (Pet'r's Mem. at 6.)  During trial, Castro testified that on or about July 6, 2009, she became involved in the Benefits Division for COBA, where she was responsible for supervising the Benefits area, including optical, dental, prescription, and life insurance. (Tr. at 296-97.)  Castro further testified that on or about October 13, 2009, the person responsible for processing benefits claims was fired, and henceforth Castro assumed full responsibility of processing benefits claims. (Id. at 306-07.)  She also testified that on or about November 18, 2009, she saw a payment notification which indicated that Blake had been paid $10,008.80 in death benefits for the insured deceased, Pearl Blake. (Id. at 309-11.)  Castro testified that she was unaware of who Pearl Blake was at that time, and had no knowledge that Blake was married until becoming aware of the insurance claim. (Id. at 311-12.)  She stated that it was her understanding prior to receiving the claim that Blake was in a long-term relationship with a New York City Department of Corrections warden named Joandrea Davis. (Id. at 312.)

Blake argues that Castro's statements made to Maquine, directly contradict her testimony at trial.  First of all, Blake argues that Castro's testimony at trial that she took over the processing of benefits claims in October 2009 is directly contradicted by her statement to Maquine that she did not take over the processing of benefits claims until the beginning of November 2009. (Pet'r's Mem. at 7.)   Blake also maintains that Castro's testimony at trial that she first learned of Blake's marriage to Pearl Blake on or about November 18, 2009, is directly contradicted by her statements made to Maquine, in which Castro stated that she was first aware of Blake's marriage in early October 2009. (Id.)

10

Husamudeen testified at trial that, in February 2010, while cleaning out Blake's former office, he discovered an opened envelope and enclosed letter addressed to Blake, dated July 21, 2009, confirming his divorce finalization. (Tr. at 536-38; Gov't's Trial Ex. 6.)  Blake maintains that this is inconsistent with Husamudeen's testimony, that "shortly" after Blake's departure, his office was occupied by two other COBA employees. (Pet'r's Mem. at 8; Tr. at 534-38.)  Blake alleges that this should have prompted the Government to investigate the occupancy timeline of Blake's former office. (Pet'r's Mem. at 8.)  Blake argues that these inconsistencies demonstrate that Castro and Husamudeen gave perjured testimony, and undermine the Government's case against Blake. (Id. at 7.)

Blake also argues that both Tejada's testimony, (Tr. at 510-12), and Husamudeen's testimony, (id. at 540-43), are perjurous in light of the post-trial affidavits of Twana Elliot ("Elliot") and Joseph Archibald ("Archibald"),[5] (Pet'r's Mem. at 11).  Elliot's post-trial affidavit relates her personal observation that all mail received by the COBA office from K&I was delivered by messenger, and that Benny Boscio ("Boscio") took occupancy of Blake's former COBA office in December 2009, at which time he "removed all of Mr. Blake's property and even made the statement that he (Boscio) was going to shred the papers belonging to Mr. Blake, that were present in said office." (Pet'r's Mem., Ex. 5 at 2-3.)  Blake contends that this contradicts Tejada's testimony that the envelope, letter, and divorce decree were sent through the U.S.P.S. (Pet'r's Mem. at 11; Tr. at 510-12.)  Blake argues that it also refutes Husamudeen's testimony that Blake's former office was "sealed off and untouched" until February 2010, at which point Husamudeen went in to clear the office, and discovered the envelope and letter. (Tr. at 534-43; Pet'r's Mem. at 10.)

---

[5] Petitioner submitted the affidavits of Elliot and Archibald as exhibits to the instant petition. (See Pet'r's Mem., Exs. 5, 6.)

Archibald's post-trial affidavit states that COBA employees shredded the documents in Blake's former office shortly after he was terminated. (Pet'r's Mem., Ex. 6.)  Blake maintains that this contradicts Husamudeen's testimony regarding entering Blake's former office in February 2010, and finding the envelope and letter. (Pet'r's Mem. at 12; Tr. at 540-43.)  Blake contends that these affidavits establish that both Tejada and Husamudeen gave perjured testimony, and negate the Government's inference that Blake possessed knowledge of his divorce. (Pet'r's Mem. at 10-12.)

The inconsistencies in Castro's testimony in regards to the dates she took over the processing of benefits claims and learned of Blake's marriage, and Husamudeen's testimony, regarding the dates when Blake's former office was vacant and when he discovered the envelope and letter, are minor, and can reasonably be attributed to "confusion, mistake, or faulty memory." Dunnigan, 507 U.S. at 94.  Such "simple inaccuracies or inconsistencies" do not suggest a willful intent by either Castro or Husamudeen to provide false testimony, and thus do not constitute perjury. Monteleone, 257 F.3d at 219.

Furthermore, the inconsistencies Blake points out are not of a material nature such that they would have prejudiced the outcome of his trial by affecting the jury's judgment.  For example, it was of little relevance as to the date that Castro assumed responsibility for processing benefit claims; rather, the material importance of her testimony was that she was unaware of Blake's marriage to Pearl Blake.  Likewise, Tejada's testimony regarding the method used to deliver the envelope and letter found in Blake's former office was not of material importance. Rather, it is the date of delivery, reflected in the COBA mail log, (Gov't's Trial Ex. 9), and on the opened envelope postmarked July 21, 2009 and addressed to Blake, (Gov't's Trial Ex. 6), that was the crucial fact.  The evidence presented at trial establishing that Blake knew that he

was divorced when he filed the dependent life insurance claim is unaffected by the minor inconsistencies in Castro's and Husamudeen's testimonies, Tejada's testimony, and the post-trial affidavits of Elliot and Archibald.  Finally, even if the testimony were perjured, upon review of all the evidence on that issue, Petitioner has not shown a fair probability that "but for the [allegedly] perjured testimony the defendant would most likely not have been convicted." Wallach, 935 F.2d at 456.

**B.      Ineffective Assistance of Counsel Claim**

An ineffective assistance of counsel claim requires that the petitioner (1) show that "counsel's performance was deficient" such that it fell "below an objective standard of reasonableness" under "prevailing professional norms," and (2) "affirmatively prove prejudice" resulting from that deficiency by a "showing that counsel's errors were so serious as to deprive the defendant of a fair trial," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable judgment." Id. at 690; see Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005) ("strategic choices made after less than complete investigation do not amount to ineffective assistance--so long as the known facts made it reasonable to believe that further investigation was unnecessary"); United States v. Cohen, 427 F.3d 164, 170 (2d Cir. 2005) ("trial decisions to offer or stipulate to certain evidence, decisions such as when to object and on what grounds are primarily matters of 'trial strategy and tactics' and are thus 'virtually unchallengeable' absent exceptional grounds for doing so").

Blake argues that his trial counsel, Ricco, failed to use material evidence and witnesses,

and failed to argue for pertinent jury instructions, resulting in ineffective assistance of counsel. (Pet'r's Mem. at 9.)  Blake argues that Elliot's testimony, which allegedly would have called into question both Husamudeen's testimony and Tejada's testimony, was pertinent to the issue of Blake's knowledge and intent, such that Ricco's failure to call Elliot as a witness prejudiced Blake. (Id. at 10-11.)  Blake also argues that the decision not to call Archibald likewise prejudiced him because Archibald would have refuted portions of Husamudeen's testimony. (Id. at 12.)  Instead, he suggests that the issue of his knowledge and intent was not properly put through "the rigors of adversarial testing." (Id. at 12.)  Blake also contends that the admission, without objection or confrontation by Ricco, of Castro's perjurous testimony regarding her knowledge of Blake's marital status and her job responsibilities, affected "the most probative issues in the case." (Id. at 12-13.)  In addition, Blake argues that Ricco's failure to request that the jury charge include (1) a New York state law instruction holding that to commit mail fraud, "the false statements [made by defendant] were material" and (2) a requirement that the jury make a determination as to whether the claim of insurance fraud had been waived based upon Prudential's subsequent conduct, were "catastrophic." (Id. at 14.)

    1.    *Failure to use material evidence and witnesses*

Any alleged errors made by counsel should be considered in the "aggregate," looking at "the 'totality of the evidence before the judge or jury,' keeping in mind that 'some errors [] have . . . a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture.'" Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001) (quoting Strickland, 466 U.S. at 695-96).  Where uncalled witness testimony is at issue, a petitioner must not only state exactly what testimony the witness would have provided, but also "how such testimony would have changed the result." Rosario v. Bennett, No. 01 Cv. 7142 (RMB) (AJP), 2002 WL

31852827, at *33 (S.D.N.Y. Dec. 20, 2002).  Moreover, "[t]he decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial. . . .  Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are similarly strategic in nature." United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987).

Blake fails to show that Ricco's decision not to call Elliot or Archibald to testify, and/or to attempt to impeach Husamudeen, Tejada, or Castro during cross-examination, was an unreasonable lapse in judgment by counsel.  The only reason to call Elliot or Archibald would have been to impeach Husamudeen, Tejada, or Castro on collateral matters.  Therefore, the Court is satisfied that Ricco's trial strategy with respect to the uncalled witnesses and witness cross-examination constituted a reasonable exercise of professional judgment.

Furthermore, Blake fails to show that had Ricco called Elliott and Archibald to testify, and/or attempted to impeach Husamudeen, Tejada, or Castro during cross-examination, it would have altered the evidentiary picture and changed the ultimate outcome of the case.  Blake states that the testimony of Elliot and Archibald was vital in order to impeach Husamudeen, Tejada, and Castro, and thereby undermine the Government's case establishing Blake's knowledge and intent.  However, as discussed supra, the testimony offered by Elliot and Archibald does not relate to any material facts that would have affected the jury's finding in light of the substantial evidence establishing Blake's knowledge and intent presented at trial through other witnesses.  Even if both Elliot and Archibald had testified, or counsel had attempted to impeach Husamudeen, Tejada, and/or Castro, it would not have changed the fact that evidence was presented which clearly demonstrated that Blake knew his divorce was finalized prior to mailing his claim to Prudential for death benefits.  Therefore, Blake fails to prove prejudice so serious as

15

to deprive him of a fair trial.

2.      *Failure to object to a jury instruction or request relevant jury instruction*

Counsel's failure to object to a jury instruction or request an additional instruction amounts to deficient performance only if the resulting jury charge contained "clear and previously identified errors." Bloomer v. United States, 162 F.3d 187, 193 (2d Cir. 1998).  A "legally correct" jury charge where counsel failed to request an additional instruction cannot amount to a deficient performance. Aparicio v. Artuz, 269 F.3d 78, 99 (2d Cir. 2001).

At trial, the Court issued the following jury instruction:

In order to prove a defendant guilty of the mail fraud count, the government must establish beyond a reasonable doubt the following four essential elements:

First, that there was a scheme or artifice to defraud a victim of money or property by means of false or fraudulent pretenses, representations or promises;

Second, that the scheme or artifice or false statements or representations concerned material facts;

Third, that the defendant knowingly and willfully devised or participated in the scheme or artifice to defraud with knowledge of its fraudulent nature and with specific intent to defraud; and

Fourth, that in the execution of that scheme, the defendant used or caused the use of the mails, as specified in the Indictment.

(Tr. at 842.)  Blake argues that Ricco should have objected to the second element of this jury instruction and instead requested a jury instruction requiring that the jury find that Blake made a "materially false statement." (Pet'r's Mem. at 14.)  This argument is unavailing.  The jury charge requested by Blake reflects New York state law, and not the federal mail fraud statute under which he was charged.  Therefore, Ricco's failure to request the suggested jury instruction or object to a legally correct jury instruction cannot constitute deficient performance.

Blake's additional argument that Ricco should have requested a jury charge requiring

16

the jury to make a determination as to whether the claim of insurance fraud had been waived based upon Prudential's subsequent conduct is similarly unavailing.  Blake maintains that where an insurer has been presented with information of alleged insurance fraud, and continues to collect policy payments without voiding the contract, any claim of insurance fraud has effectively been waived. (Pet'r's Mem. at 16 (citing <u>Sec. Mut. Life Ins. Co. of New York v. Rodriguez</u>, 65 A.D.3d 1, 2 (N.Y. App. Div. 2009)).)  Blake contends that because (1) there is no evidence that Prudential would have refused the payments after being notified of Blake's alleged insurance fraud, and (2) Prudential failed to void the group insurance policy contract with COBA after being notified of Blake's alleged fraud, Ricco's failure to request a "waiver" jury instruction amounted to ineffective assistance of counsel.  However, Blake again fails to distinguish between state and federal law; insurer "waiver" only applies under New York state law. <u>See</u> <u>Am. Gen. Life Ins. Co. v. Salamon</u>, No. 09-CV-5428 (KAM) (SMG), 2011 WL 976411, at *3 (E.D.N.Y. Mar. 16, 2011) (holding waiver is the "voluntary and intentional relinquishment of a known right" under New York state law).  Therefore, Ricco's failure to request a "waiver" jury instruction and engage in a meritless course of action cannot constitute deficient performance.

## C.    <u>Skilling</u> and <u>Black</u> Limitations and New York State Law

Finally, Blake argues that the Indictment is defective on its face because it fails to allege any scheme of bribery or kickbacks, which he maintains is necessary for the federal mail fraud statute to apply, based upon the limitations set forth by the Supreme Court in <u>Skilling v. United States</u>, 130 S. Ct. 2896 (2010) and <u>Black v. United States</u>, 130 S. Ct. 2963 (2010).  Blake argues that the <u>Skilling</u> and <u>Black</u> decisions limit the reach of the federal mail fraud statute by criminalizing only schemes or artifices to defraud that involve <u>bribery or kickbacks</u>, and that no

17

such allegations were made in his case. (Pet'r's Mem. at 20.)

      Blake's argument fails on multiple grounds.  First, since he could have raised these issues on direct appeal, and does not show cause for failing to do so, Blake's claim is procedurally barred.  Second, his argument also fails on the merits.  The two cases Blake cites in support of his argument do not apply to the mail fraud statute under which Blake was charged and convicted.  Skilling applies only to honest services fraud, under 18 U.S.C. § 1346, and not to conventional fraud, such as the mail fraud statute (18 U.S.C. § 1341) under which Blake was convicted. 130 S. Ct. at 2969 (internal citations omitted) (holding that unlike conventional fraud, "in which the victim's loss of money or property supplied the defendant's gain," honest services fraud is targeted at corruption that lacks such symmetry, in which the "offender profited but the betrayed party suffered no deprivation of money or property").  Black likewise only addresses "what conduct Congress rendered criminal by proscribing, in § 1346, fraudulent deprivation of the intangible right of honest services."  130 S. Ct. at 2968 (emphasis added).   Lower courts interpreting Skilling have clarified that the decision was not intended to "inser[t] additional elements or limitations to the traditional mail or wire fraud statutes." United States v. Fenzl, 731 F. Supp. 2d 796, 800 (N.D. Ill. 2010); see also Dupre v. United States, No. 11 Cv. 4454, 2012 WL 2953970, at *2 (S.D.N.Y. July 20, 2012) (holding that Skilling only applies to honest services fraud charged under § 1346, and not to "conventional fraud scheme[s]"); United States v. Conti, Criminal No. 08-05, 2010 WL 4613798, at *5 (W.D. Pa. Nov. 5, 2010) ("Skilling does not apply to the charges of traditional fraud pursuant to the mail and wire fraud statutes").

      Blake's argument fails to distinguish between honest services fraud and conventional fraud.  At trial, the Government did not advance any alternative theory of honest services fraud.  Thus, Blake's conviction under conventional mail fraud is unaffected by the rulings in either

Skilling or Black.

Blake also argues that his conviction violates federalism because it was not based upon a violation of New York state law. (Pet'r's Mem. at 20 (citing United States v. Brumley, 116 F.3d 728, 734-35 (5th Cir. 1997) (holding that honest services under § 1346 requires "that services must be owed under state law and that the government must prove in a federal prosecution that they were in fact not delivered") (emphasis added)).)  Again, however, Blake fails to distinguish between honest services fraud and conventional fraud.  His conviction under the conventional mail fraud statute is unrelated to honest services fraud, and therefore Brumley, like Skilling and Black, provides no basis to overturn Blake's conviction.

## V.    CONCLUSION

For the foregoing reasons, Petitioner's motion pursuant to § 2255 (ECF No. 66) is denied. It is hereby certified, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).  As the Petition makes no substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253.


IT IS SO ORDERED.

Dated: New York, New York
       August 2, 2012

_____
Robert P. Patterson, Jr.
U.S.D.J.

19

**Copies of this order were faxed to:**

*Counsel for Defendant:*
Damond J. Carter, Esq.
369 Lexington Ave., 2nd Floor
New York, NY 10017
Fax: (888) 711-4420

*The Government:*
Santosh Shankaran Aravind
U.S. Attorney's Office, SDNY
One St. Andrew's Plaza
New York, NY 10007
Fax: (212) 637-2937

20