UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ALLEN BLAKE,

                         Petitioner,

     - v. -

UNITED STATES OF AMERICA,

                         Respondent.
------------------------------------------------------------X

10 Cr. 349 (LAP)
12 Cv. 1843 (LAP)

**OPINION & ORDER**

**LORETTA A. PRESKA, Chief U.S.D.J.**

      After the death of his ex-wife, Allen Blake ("Blake") filed an insurance claim for a $10,000 death benefit in which he falsely represented that he remained married to the deceased. Blake was charged and convicted of federal mail fraud under 18 U.S.C. § 1341 and § 1342, and now seeks a writ of error coram nobis to vacate his conviction. Blake contends, inter alia, that his trial counsel was ineffective for failing to argue that New York state insurance law entitled Blake to the death benefit, notwithstanding the fact that Blake obtained the death benefit by misrepresenting his marital status. For the reasons set forth below, Blake's petition is denied.

## FACTUAL BACKGROUND[1]

      From 2006 to November 20, 2009, Blake was a Correctional Officer employed by the City of New York Department of Corrections and a board member of the Correction Officer's Benevolent Association ("COBA"). As part of his union contract with COBA, Blake was

---

[1] The factual information in this section is taken in large part from Judge Patterson's opinions in Blake v. United States, Nos. 10 Cr. 349, 12 Cv. 1843 (RPP), 2012 WL 3154989, at *1-2 (S.D.N.Y. Aug. 3, 2012), and United States v. Blake, No. 10 CR 349 (RPP), 2011 WL 3463030, at *1-3 (S.D.N.Y. Aug. 5, 2011).

1

entitled to death benefits with Prudential Life Insurance Company of America ("Prudential") in the event of the death of his lawful spouse. (Trial Transcript ("Tr.") at 307, 332.) In May 2008, Blake filed for divorce from his estranged wife, Pearl Blake. (Gov't's Trial Ex. 7.) On June 23, 2009, the divorce was granted. (Id.) Three months later, on September 29, 2009, Pearl Blake died. (Gov't's Trial Ex. 12; Tr. at 332.)

On October 23, 2009, Blake submitted a claim to Prudential for a $10,000 death benefit for Pearl Blake's death, listing his relationship to the deceased as "husband." (Gov't's Trial Ex. 3; Tr. at 322.) On or about November 17, 2009, Blake received $10,000 on the policy from Prudential. (Tr. at 328-29.) Shortly thereafter, COBA board members learned about Blake's divorce. (Id. at 332-35.) At an emergency COBA Board meeting on November 20, 2009, Norman Seabrook ("Seabrook"), the President of COBA, confronted Blake and asked him to "[e]xplain . . . how this death benefit [claim] is put in and you don't have the [supporting] documents." (Id. at 592.) Blake "just shook his head." (Id. at 593-94.) Seabrook demanded and received Blake's resignation that same day. (Id.) On or about November 25, 2009, Blake returned to Prudential the $10,000 he received on the policy. (Tr. at 410-11, 423-27.)

On April 20, 2010, Blake was indicted for mail fraud in violation of 18 U.S.C. § 1341 and § 1342 for devising a scheme to defraud an insurance company of life insurance benefits to which he was not entitled and in which the United States Postal Service ("U.S.P.S.") was used. (Indictment 4/20/10.) The critical issue at trial was whether Blake knew that his divorce had been finalized on or before October 23, 2009, the date he submitted his claim for death benefits. See United States v. Blake, No. 10 CR 349 (RPP), 2010 WL 3184487, at *1 (S.D.N.Y. Aug. 9, 2010). At trial, the Government presented documentary evidence and witness testimony

2

supporting its position that Blake intentionally and knowingly submitted a false life insurance claim on behalf of the deceased Pearl Blake.

The Government's evidence included: (1) a copy of Blake's divorce judgment signed by the county clerk on June 23, 2009 and filed with the New York County Clerk's Office on July 7, 2009, (Gov't's Trial Ex. 4); (2) COBA mail logs registering receipt of a letter from Koehler & Isaacs ("K&I"), the law firm that handled Blake's divorce, to Blake at his COBA office on July 23, 2009, (Gov't's Trial Ex. 9); and (3) an opened envelope addressed to Blake bearing a barcode consistent with processing through the U.S.P.S., and a letter addressed to Blake from K&I paralegal Claudia Tejada ("Tejada"), dated July 21, 2009, confirming the finalization of Blake's divorce. (Gov't's Trial Ex. 6.)

At trial, Tejada testified that on July 13, 2009 she called Blake and "told him that . . . his divorce was signed." (Tr. at 508.) She also testified that on July 21, 2009, she mailed to Blake, via the U.S.P.S., a letter confirming his divorce and a copy of the divorce judgment in a K&I envelope. (Id. at 510-11, 519; Gov't's Trial Ex. 6.) Tejada further testified that the divorce judgment was dated July 7, 2009, "the date that it was actually filed in the [office of the] county clerk." (Tr. at 514.) The parties stipulated that the divorce judgment was "an official public record of the judgment of divorce" and that it was admitted into evidence without objection. (Id. at 513; Gov't's Trial Ex. 4.)

Joseph Bracco ("Bracco"), a member of the COBA Executive Board, testified that on or about September 29, 2009, the day of Pearl Blake's death, Blake told him that "it was messed up that he couldn't collect on the life insurance policy because . . . he had just recently became [sic] divorced in July" and that Blake asked him whether "there was a grace period" on the policy, to which Bracco replied there was not. (Tr. at 438.) Thomas Farrell, a COBA Board Member,

testified that in September 2009, Blake told him that he was going to South Carolina for his "ex-wife's funeral" and that "[if] the bitch or broad would have died a couple of months earlier, [he] would have gotten the money." (Id. at 652-55.) Seabrook testified that Blake said his "exwife [sic] [had] died" sometime in September 2009. (Id. at 589.) Seabrook also testified that when Blake was confronted at the November 20, 2009 COBA Board meeting, "[Blake] looked at me and he said, 'I fucked up.'" (Id. at 593.)

Elias Husamudeen ("Husamudeen"), the First-Vice President of COBA, testified that as he was cleaning Blake's former office at COBA on a weekend in February 2010 (approximately three months after Blake's resignation), he found an opened envelope and enclosed letter addressed to Blake, dated July 21, 2009, confirming the finalization of Blake's divorce. (Id. at 538; Gov't's Trial Ex. 6.) Husamudeen further testified that the letter had been received and logged in the COBA system on July 23, 2009. (Tr. at 542; Gov't's Trial Ex. 9.) Elizabeth Castro ("Castro"), the Third-Vice President of COBA, testified that she discovered a receipt of the claim Blake submitted to Prudential and that the claim contained a representation that Blake was married to Pearl Blake, when, in fact, the two were divorced. (Tr. at 309-25, 329-33; Gov't's Trial Ex. 2.)

Blake was represented at trial by attorney Anthony Ricco ("Ricco" or "trial counsel"). Blake did not testify but presented the testimony of one witness, investigator Jacqueline Maquine ("Maquine") of the New York City Department of Investigations, and introduced one set of documents into evidence. Maquine testified that she conducted an interview with Bracco in December 2009 and that she memorialized that interview in a written report.[2] (Tr. at 712-15.)

---

[2] Maquine provided copies to the Government of the statements made to her by Castro, and the Government included the statements in its 3500 materials. (Tr. at 713.)

4

This report contained information which was somewhat inconsistent with Bracco's trial testimony. (Id.) The set of documents consisted of a file maintained by Prudential relating to Blake's claim (the "Prudential file"). (Id. at 731, 745; Blake Trial Ex. A.) The Prudential file was admitted into evidence over the Government's objection, and included a copy of the divorce judgment filed in the County Clerk's office on July 7, 2009, bearing a timestamp of July 11, 2009 (thereby conflicting with the timestamp of June 1, 2010 on the divorce judgment entered into evidence as Government Trial Exhibit 4).[3] (Id. at 734-42.)

## PROCEDURAL HISTORY

On June 15, 2010, following three days of trial, the jury returned a verdict of guilty on the single count of mail fraud contained in the Indictment. (Id. at 873-74; see J. dated Nov. 1, 2010, ECF No. 53.)[4] On July 5, 2010, Blake filed a motion for a new trial pursuant to Fed. R. Crim. P. 33(b)(2) ("Rule 33"), which was denied by Judge Patterson on August 9, 2010. Blake, 2010 WL 3184487, at *6. On November 1, 2010, Blake was sentenced to three years of probation with three months of home confinement. (J. dated Nov. 1, 2010, ECF No. 53.)

---

[3] At trial, the Government explained the differences in the timestamps as follows:

> The document that's in the Prudential file is time stamped July 11, 2009. Government Exhibit 4 that's been admitted into evidence and that the parties stipulated to contains a time stamp of June 1, 2010. The reason why that is . . . is that the Department of Investigation, as they were preparing for this case, went to the family court to obtain a certified copy of that judgment. We have that copy. We have the actual original certified copy. This time stamp reflects that. You can read it . . . . It says that, "I've compared this copy with the original filed in my office on July 7, 2009."
>
> These documents are the exact two same documents - - they're the exact document, which is the judgment of divorce dated July 7, 2009. The time stamp only reflects that someone went to the family court and obtained a certified copy of the judgment.

(Tr. at 734-35.)
[4] All ECF entries refer to the criminal docket, 10-CR-349, unless otherwise noted.

5

N/A

On February 7, 2011, Blake filed a second Rule 33 motion. (ECF No. 56.) Blake initially filed the motion pro se but later retained Damond Carter, who had represented Blake's co-defendant at trial. On April 4, 2011, Blake filed a motion for default judgment against the Government on his Rule 33 motion. (ECF No. 59.) On August 5, 2011, Judge Patterson issued an opinion and order denying both the Rule 33 motion and the motion for default judgment. (ECF No. 64.)

On October 13, 2011, Blake filed a motion to vacate and set aside his conviction pursuant to 28 U.S.C. § 2255. (ECF Nos. 66, 67.) Blake contended that (1) the Government knowingly or negligently produced perjurious evidence; (2) he received ineffective assistance of counsel; and (3) recent Supreme Court decisions precluded his mail fraud conviction. Blake, 2012 WL 3154989, at *3. Of particular relevance to the instant motion, Blake argued that his trial counsel was ineffective for failing to request a "materiality" instruction that contemplated Blake's alleged entitlement to the death benefit under New York state insurance law. Id. at *9-10. Judge Patterson held that the claim of perjured testimony was procedurally defaulted because Blake failed to file a direct appeal and denied all of Blake's claims on the merits. Id. at *5. Regarding the claim of ineffective assistance of counsel, the court found that the charge requested by Blake "reflected New York state law, and not the federal mail statute under which he was charged," and therefore trial counsel's failure to request a New York state law instruction did not constitute deficient performance. Id. at *9.

On May 1, 2013, Blake appealed the denial of his § 2255 petition. (ECF No. 74.) Upon reviewing Blake's habeas petition, the Second Circuit became aware that Blake had made a timely attempt to file a direct appeal in 2010 but that the circuit court never received notice of Blake's appeal due to a docketing error. See United States v. Blake, 558 F. App'x 129, 130 n.1

6

(2d Cir. 2014), cert. denied, 135 S. Ct. 286 (2014). Because the district court denied the § 2255 petition in part on the grounds that Blake had neglected to pursue a direct appeal, the Second Circuit vacated the district court's denial of the § 2255 and reviewed the appeal of the § 2255 as a direct appeal from Blake's judgment of conviction. Id. On March 17, 2014, the Second Circuit affirmed Blake's conviction but declined to address the claims of ineffective assistance of counsel on the grounds that such claims are properly considered in a collateral proceeding. Id. at 130-31.

On July 29, 2014, Blake filed the instant petition for a writ of error coram nobis asserting claims of ineffective assistance of counsel. (Mem. of Law in Supp. of Pet. for Writ of Coram Nobis ("Pet'r's Mem."), No. 12-CV-1843, ECF No. 8.)

## LEGAL STANDARD

Coram nobis is an "extraordinary remedy," United States v. Morgan, 346 U.S. 502, 511 (1954), generally sought to review a criminal conviction when habeas corpus is unavailable because the petitioner is no longer in custody. See Porcelli v. United States, 404 F.3d 157, 158 (2d Cir. 2005). "'Continuation of litigation after final judgment and exhaustion or waiver of any statutory right of review should be allowed through this extraordinary remedy only under circumstances compelling such action to achieve justice.'" Fleming v. United States, 146 F.3d 88, 90 (2d Cir. 1998) (quoting Morgan, 346 U.S. at 511). "In reviewing a petition for the writ, a federal court must presume the proceedings were correct. The burden of showing otherwise rests on the petitioner." Id. (citation and internal quotation marks omitted). In order to obtain coram nobis relief, a petitioner must demonstrate that "(1) there are circumstances compelling such action to achieve justice, (2) sound reasons exist for failure to seek appropriate earlier relief, and (3) the petitioner continues to suffer legal consequences from his conviction that may be

7

remedied by granting of the writ." Foont v. United States, 93 F.3d 76, 79 (2d Cir. 1996) (citations and internal quotation marks omitted).

Ineffective assistance of counsel is one ground for granting a writ of error coram nobis. Kovacs v. United States, 744 F.3d 44, 49 (2d Cir. 2014). To prevail on a claim of ineffective assistance of counsel, the petitioner must show that (1) defense counsel's performance was deficient as to fall below an objective standard of reasonableness; and (2) the deficient performance so prejudiced the defense that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 687–88, 694 (1984).

"In applying this standard, a reviewing court must . . . 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] might be considered sound trial strategy.'" United States v. Cohen, 427 F.3d 164, 167 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 689) (alterations in original). "Paramount to any such review . . . is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. (citations and internal quotation marks omitted).

## DISCUSSION

### I. Blake Fails to Demonstrate that He Received Ineffective Assistance of Counsel

Blake contends that New York state insurance law afforded him an opportunity to convert his ex-wife's policy following their divorce and that because his request to Prudential was made within the conversion period, he was entitled to his ex-wife's death benefit. (Pet'r's Mem. at 4, 7.) Of course, Blake did not request conversion; Blake falsely represented to Prudential that he was still married to his ex-wife. Nevertheless, Blake contends that his counsel

8

was ineffective in (1) failing to "move for dismissal where the State's insurance law was dispositive of Mr. Blake's entitlement" to the death benefit; and (2) failing to ask for a materiality instruction concerning Blake's alleged entitlement to the death benefit under New York state law.[5] [6] (Id. at 2, 7.)

Both of these arguments are based on the erroneous premise that Blake could not have been convicted of federal mail fraud if he was entitled to the death benefit under New York state law. To convict Blake of federal mail fraud, the Government must prove that Blake engaged in the "(1) use of the mails to further (2) a scheme to defraud with (3) money or property as the object of the scheme" and that Blake had a specific intent to defraud. Porcelli v. United States, 404 F.3d 157, 162 (2d Cir. 2005). "Once a mailing is made with the requisite fraudulent intent, the crime of mail fraud is complete." United States v. Lauersen, No. 98 CR. 1134 (WHP), 1999 WL 637237, at *5 (S.D.N.Y. Aug. 20, 1999). Blake's alleged entitlement to the death benefit under New York state law is relevant only if it serves to negate one of the elements of federal mail fraud or Blake's fraudulent intent.

---

[5] Specifically, Blake argues that the jury should been instructed that it "could only find Mr. Blake's alleged false statement to be material if the jury first found" that the insurance policy and New York state insurance law "mandated Prudential to pay Mr. Blake . . . *only* if he were married to Ms. Blake." (Pet'r's Mem. at 6.) (emphasis in original). Further, if the jury found Prudential was mandated to pay the death benefit to Blake "irrespective of whether Mr. Blake was married to Ms. Blake, the jury was to conclude that Mr. Blake's alleged statement was not material." (Id.)

[6] Blake also contends that he was prejudiced by trial counsel's failure to "use exculpatory evidence," but it is not clear to which evidence Blake refers. (Pet'r's Mem. at 2.) Blake's argument appears to be that Government witnesses relied on the wrong benefits booklet during their testimony. However, Blake makes no attempt to explain how this alleged error so prejudiced Blake "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687–88, 694 (1984).

Though he now recasts it in terms of "materiality," Blake's entitlement argument has already been rejected by the Second Circuit. On appeal, Blake argued that because he was allegedly entitled to his ex-wife's death benefit under New York law, "his false statement on the insurance claim that he remained married to the insured deceased was . . . insufficient as a matter of law to prove that he had an intent to defraud." United States v. Blake, 558 F. App'x 129, 130 (2d Cir. 2014). The Second Circuit concluded that "Blake's reliance on 'entitlement' to challenge sufficiency is foreclosed by precedent holding that a claim of right to funds obtained through a false statement is not a defense negating fraudulent intent." Id. (citing United States v. Gole, 158 F.3d 166, 168 (2d Cir. 1998) ("[C]ourts have uniformly held that a claim-of-right is not a defense to mail fraud.")). Although "an honest misstatement is insufficient to prove fraudulent intent," Blake has never contended that his false statement was made in good faith, or that he reasonably believed his marital status was immaterial to the disbursement decision. Id. (citing United States v. Rossomando, 144 F.3d 197, 200-03 (2d Cir. 1998)). To the contrary,

> the evidence showed that [Blake] fully expected that his claim would be denied if he truthfully reported to Prudential that he and his wife divorced prior to her death. Thus, like the defendant in Gole, Blake chose intentionally to deceive Prudential by submitting knowingly false information to obtain insurance proceeds rather than employing legal channels to challenge the anticipated denial.

Id.

The Second Circuit's analysis forecloses Blake's claims of ineffective assistance of counsel. The evidence at trial overwhelmingly demonstrated that Blake knew his divorce was finalized prior to mailing a claim to Prudential in which he falsely professed to be the husband of the deceased. Blake's alleged entitlement under state law neither constituted a defense to federal mail fraud nor negated his fraudulent intent. Blake, 558 F. App'x at 130. Therefore, Blake's trial counsel was not unreasonable for failing to move for dismissal on the grounds that "State

10

insurance law was dispositive of Mr. Blake's entitlement" and failing to request a materiality instruction concerning Blake's alleged entitlement under New York state insurance law, because both of these arguments are meritless. See United States v. Arena, 180 F3d. 380, 396 (2d Cir. 1999) ("Failure to make a meritless argument does not amount to ineffective assistance."), abrogated on other grounds by Scheidler v. Nat'l Org. for Women, Inc., 537 U.S. 393, 404 n.8 (2003).[7] Because Blake fails to establish that trial counsel's conduct constituted deficient performance, his claims of ineffective assistance are denied. Further, because Blake has failed to demonstrate any circumstances compelling coram nobis relief, his petition is denied. Foont v. United States, 93 F.3d 76, 79 (2d Cir. 1996).

## II.   Blake Fails to Allege Continuing Consequences from his Conviction

Blake also fails to demonstrate that he "continues to suffer legal consequences from his conviction that may be remedied by granting of the writ" of error coram nobis. Foont v. United States, 93 F.3d 76, 79 (2d Cir. 1996) (quoting Nicks v. United States, 955 F.2d 161, 167 (2d Cir. 1992)). Blake argues only that his "continued disqualification from many of the privileges enjoyed by members of our society (e.g. prohibition from voting), because the legal conviction renders him a felon, undoubtedly constitutes a continuing consequence of his conviction." (Pet'r's Mem. at 6.) This statement, without more, is insufficient to support a writ of coram nobis. "[A] petitioner must at least point to a concrete threat that an erroneous conviction's

---

[7] Blake also argues that the McCarran-Ferguson Act reverse preempts the federal mail fraud statute. (Pet'r's Mem. at 8-9.) The Court has considered this argument and determined it to be entirely without merit. The application of the federal mail fraud statute "enhance[s] the state's interest in prohibiting insurance fraud." United States v. Peterson, 896 F. Supp. 2d 305, 319 (S.D.N.Y. 2012); see also United States v. Lauersen, No. 98 CR. 1134 (WHP), 1999 WL 637237, at *5 (S.D.N.Y. Aug. 20, 1999) ("Where an insurance claimant submits false and misleading invoices and thereby deprives the carrier from determining for itself the merit of the claim based on truthful representations, the carrier has been defrauded.")

11

lingering disabilities will cause serious harm . . . ." Fleming v. United States, 146 F.3d 88, 91 (2d Cir. 1998) (citations and internal quotation marks omitted).

Courts have found various "lingering disabilities" sufficient to warrant coram nobis relief. Id. at 90. For example, a petitioner continues to suffer consequences of her conviction where she is deprived of her right to vote under state law, Kyle v. United States, 288 F.2d 440, 441 (2d Cir. 1961) (per curiam), the prior conviction is relied upon as an aggravating factor in sentencing for a subsequent offense, Nicks, 955 F.2d at 167, or the conviction serves as grounds for permanent deportation, Shishkin v. United States, No. 10-CV-4201 (CBA), 2013 WL 6859844, at *3 (E.D.N.Y. Dec. 30, 2013). Additionally, a petitioner continues to suffer the consequences of her conviction where a statute imposes a legal impediment preventing her from reentering the professional world. See, e.g., United States v. Foont, 901 F. Supp. 729, 734 (S.D.N.Y. 1995), aff'd, 93 F.3d 76 (2d Cir. 1996) ("A statute which bars [the petitioner] from reentering his profession presents just the kind of continuing legal consequence that justifies allowing a defendant to properly move a court to issue a *coram nobis* writ.").

However, "[m]ere stigma or reputational harm is insufficient to constitute a legal consequence." Dixon v. United States, No. 14-CV-960 (KMK), 2015 WL 851794, at *12 (S.D.N.Y. Feb. 27, 2015); see also Fleming, 146 F.3d at 90. Further, it is insufficient to allege purely speculative harms. Fleming, 146 F.3d at 91 (continuing legal consequences absent where the record "contains no evidence that petitioner has sought and been denied licensure as a securities broker, that he has ever been so employed in the past, or that he could obtain such employment but for his conviction").

Blake's only specific claim is that his conviction disqualifies him from voting. (Pet'r's Mem. 6). While disenfranchisement can constitute a continuing consequence supporting a writ

of error coram nobis, Kyle, 288 F.2d at 441, Blake fails adequately to allege that he suffers from this particular harm. Blake has not referenced any law that prevents him from voting, nor has he alleged any instance where he was denied the right to vote. Moreover, if Blake still resides in New York (he has not indicated otherwise), he has been eligible to vote since he was discharged from probation in 2012. (J. of 11/4/10, ECF No. 53) (sentencing Blake to two years of probation with three months home confinement);[8] N.Y. Elec. Law § 5-106 (the right to vote is restored after the "maximum sentence of imprisonment has expired, or [the offender] has been discharged from parole"). Because Blake has not identified any specific continuing consequences of his conviction, his petition must be denied. Fleming, 146 F.3d at 91.

## CONCLUSION

For the foregoing reasons, Blake has failed to demonstrate circumstances compelling coram nobis relief and has failed to identify a continuing legal consequence of his conviction that may be remedied by the granting of a writ of coram nobis. Accordingly, Blake's Petition for a writ of error coram nobis (No. 12-CV-1843, ECF No. 7-8.) is DENIED.

SO ORDERED.

Dated: New York, New York
May 2Y, 2015

_Loretta A. Preska_
Loretta A. Preska
Chief U.S.D.J.

---

[8] Blake was discharged from probation in the Eastern District of New York on October 31, 2012.

**Copies of this opinion and order were sent to:**

**Lillane G. Mair**
Gerhardt Mair & Associates, P.C.
44 Court Street
Brooklyn, NY 11201
(646) 229-3949
Email: gerhardt.mairesq@yahoo.com


**Damond Jamal Carter**
Damond J. Carter, PLLC(2nd)
Post Office Box 6365
Albany, NY 12203
(518)438-1676
Fax: (973)-672-0260
Email: damcart@hotmail.com


**Santosh Shankaran Aravind**
U.S. Attorney's Office, SDNY (St Andw's)
One St. Andrew's Plaza
New York, NY 10007
(212) 637-1045
Fax: (212) 637-2937
Email: SANTOSH.ARAVIND@USDOJ.GOV